EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):** USAA Casualty Insurance, Inc.
Bank of America Corp. Inc
Equifax Inc.
Trans Union, Corp.

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

Lisa Douglass

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAR 16 2016

Sherri R. Carter, Executive Office/Clerk
By: _____, Deputy
Ishayla Chambers

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is: Stanley Mosk
(El nombre y dirección de la corte es): 111 N Hill St
Los Angeles CA 90019

**CASE NUMBER:** (Número del Caso): BC613959

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Same as above

**DATE:** March 16, 2016    Clerk, by Sherri R. Carter / Ishayla Chambers, Deputy
(Fecha)                     (Secretario)                              (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): USAA, Bank of America, Equifax, TransUnion
   under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

[SEAL]
MAR 16 2016

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

LISA DOUGLASS, Individually as Plaintiff
101 S. Sycamore Av. #5
Los Angeles, CA 90036
323-346-5175

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAR 16 2016

Sherri R. Carter, Executive Officer/Clerk
By Shaunya Bolden, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| LISA DOUGLASS,<br><br>Plaintiff<br><br>Vs.<br><br>USAA Casualty Insurance, Incorporated<br><br>&<br><br>Bank of America Corporation, Inc.<br><br>&<br><br>Equifax, Inc.<br><br>&<br><br>TransUnion, Corp. | Case No. **BC 6 1 3 9 5 9**<br><br>COMPLAINT FOR DAMAGES<br><br>1. Violations of the Fair Reporting Act<br>2. Credit Damage<br>3. Gross Negligence<br>4. False Reporting<br>5. Fraudulent Charges |

UNITED STATES SUPERIOR COURT
Los Angeles, CA

(Lisa Douglass )
(JURY DEMAND ENDORSED HEREIN)

Now comes Plaintiff, Lisa Douglass, and for her Complaint

against Defendants, Equifax, Inc., TransUnion, Inc and USAA Casualty Insurance, Inc., Inc and Bank of America Corporation, Inc., states as follows:

INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American citizens. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should ultimately benefit from the resulting convenience and efficiency.

2. Unfortunately, however, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can sustain substantial damage, both emotionally and economically, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant Equifax Inc. acknowledges this potential for misuse and resulting damage every time it solicits its credit monitoring service to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers and similar interested parties) information, commonly called "consumer reports," concerning individuals who may be applying for retail credit, for the lease of an apartment, for a car or mortgage loan, for employment or the like.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system: The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
See 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home or drop out of school. We are not nearly as much concerned over thepossible mistaken turn-down of a consumer for a luxury item as we are over thepossible destruction of his good name without his knowledge and without reason.

* * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed (emphasis added).

Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

8. To further the primary goal of greater accuracy, the FCRA has also required CRAs, as well as "furnishers" of credit information to the CRAs, to conduct "reasonable investigations" into bona fide disputes sent to CRAs by consumers claiming to have inaccurate or incomplete information appearing in their credit files, to correct or update any such errors or omissions, and to report back to the consumer the results of the investigation.

9. This action seeks compensatory, statutory, and punitive damages, costs and reasonable attorneys' fees for Plaintiff, Lisa Douglass ("Ms. Douglass" or "Plaintiff"), against Equifax Inc, TransUnion, Inc. and USAA Casualty Insurance, Inc. and Bank of America Corporation, Inc., for their willful and/or negligent violations of the Fair Credit Reporting Act, as described herein.

JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. §1681p. Venue in this superior court is proper because Plaintiff resides in this judicial district and many of the facts relevant to this Complaint occurred in this judicial district.

PARTIES

11. Plaintiff, Lisa M. Douglass ("Plaintiff" or "Ms. Douglass"), is an adult individual presently residing in Los Angeles, California. Plaintiff is a "consumer" as defined in Section 1681a(c) of the FCRA.

12. Defendants, Equifax, Inc ("Equifax"), is a California Corporation doing business throughout the country and in the State of California. Equifax is a "consumer reporting agency" as defined in Section 1681a(f) the FCRA. Equifax is one of the largest CRAs in the world.

12a. Defendants TransUnion, Inc., is a California Corporation doing business throughout the country and in the State of California. Equifax is a "consumer reporting agency" as defined in Section 1681a(f) the FCRA. Equifax is one of the largest CRAs in the world.

13. Defendant, USAA Insurance ("USAA"), is an independently owned, community bank headquartered in Texas, doing business nationally for former veterans and their sons and daughters. USAA is a "furnisher" of consumer credit information as that term is used in Section 1681s-2
of the FCRA.

14. Defendant, Bank of America Corporation is an independently owned national bank, doing business nationally and in California and is a "furnisher of consumer credit information as that term is used in Section 1681s-2.

FACTUAL ALLEGATIONS

15. Plaintiff takes great pride in her good name and established credit rating, so she works hard to ensure that her bills are paid in-full and on-time every month. As such, Plaintiff believes and understands that her credit record with all of her creditors is excellent.

16. On June 30th, 2015, Ms. Douglass noticed a $500 "credit adjustment on her World Mastercard with USAA.

17. Ms. Douglass Called and submitted a request to file a dispute with USAA, which they assured her they had done.

18. Ms. Douglass noticed that though she had filed a dispute she was being charged late fees and finance charges, which isn't supposed to take place. When she called, she was told that no one would speak to her regarding this $500 dollars and she received a letter to that effect. In the letter, it simply says, "we will not speak to you regarding this issue."

19. Ms. Douglass sent a certified letter asking that someone please look at this error and no one ever responded. Actually they did respond by turning her into collections. The Collection Agency is owned and operated by USAA. They called repeatedly and sent many letters saying that Ms. Douglass was in violation of paying her "bill." When Ms. Douglass reported that this amount of money was in dispute and not subject to fees and finance charges, they repeatedly hung up on her.

20. Ms. Douglass noticed on another card that a $1000 adjustment had been placed on the card. When she called, they told her she was unable to file a dispute for a "credit adjustment."

21. Ms. Douglass filed a letter with the Financial Consumer Protection Bureau. At which time USAA said "we resent these allegations and give a permanent credit to Ms. Douglass' account in the amount of $1000." So, not only had they put 500 on one card, but then put $1000 on another card, resented her allegations, but then removed it, admitting the oversight it in writing.

22. Ms. Douglass then asked for the $500 to be reversed and began getting letters saying her credit card was cut off for late payment.

23. Ms. Douglass received multiple phone calls from the USAA collection agency. When she reported this as a mistake, the clerk told her many times USAA made these math errors all the time and to just explain it when she called.

24. After calling over 45 times and writing numerous letters, Ms. Douglass was notified by mail that her credit score dropped due to late payment.

25. Ms. Douglass then filed a suit in small claims court.

26. The attorney for the other side, Maureen Michael called Ms. Douglass to settle out of court saying that USAA would drop Ms. Douglass from all three cards if she didn't settle. Ms. Douglass said she didn't like to be threatened and left it at that.

27. The weeks before the trial date in small claims, Ms. Douglass credit limit was substantially lowered from two of her Bank of America credit cards, they lowered her amount substantially for a late payment going onto her credit reports.

28. When Ms. Douglass tried to contact Bank of America, they told her it was due to the reporting of USAA claiming she paid late or not at all.

29. Ms. Douglass is a full time student and had planned on using the amounts left (in the amount of ($6000) to pay her tuition. When she called to explain her situation they told her the only way she could get the amounts back was to do a hard inquiry.

30. Ms. Douglass refused to allow this and researched further. Two years prior, Ms. Douglass was speaking to an agent at Bank of America, when doing a balance transfer and asked that some of the money on one card be moved to another card. The agent did not inform her that they were doing a hard inquiry in order to shift around some of her credit. Ms. Douglass had Bank of America corporate offices investigate.

31. Bank of America called to apologize that this agent had not told Ms. Douglass and promised to have the hard inquiry removed post haste. At that time they also credited her $800 for balance transfers as an apology.

32. Despite Ms. Douglass calling and letters to Bank of America, they kept telling her that it was up to her to have TransUnion and Equifax remove this inquiry.

33. Ms. Douglass called and wrote to TransUnion and Equifax to have this hard inquiry removed but never heard back.

34. Ms. Douglass wrote to the Better Business Bureau and they told her it was out of their jurisdiction because she had filed a small claims case. Subsequently, the case was not heard because there was a pro-tem and Ms. Douglass saw that now, one issue with USAA had caused three other issues with her credit.

35. Regarding the recent drop in two cards of Bank of America, Ms. Douglass was phoned by an agent by the name of Angela Lees. Ms. Lees told Ms. Douglass that Bank of America had no intention of removing the hard inquiry and would not change back the credit limits so Ms. Douglass could stay in school. She said that any investigation would result in yet another hard inquiry.

36. Ms. Douglass thought perhaps now that she would have to drop out of school, that she should write to the President of Bank of America. She sent a certified letter and was ignored.

37. Ms. Douglass trusted Bank of America to keep their word to remove this hard inquiry and found it an untenable situation that every phone call and letter was simply deflected with, "Though we promised, you wait two years."

38. The day before court, Ms. Douglass found that USAA attempted to call their attorney Maureen Michaels and she did not respond. Ms. Douglass thought this was a mistake and spoke with her assistant who told her she most certainly is getting the calls, she's just ignoring you. The damage USAA did to Ms. Douglass rating caused Bank of America to drop her limits causing a substantial drop in her credit score. On the day Ms. Douglass showed for court, there was a Pro-Tem sitting in for the regular judge and Ms. Douglass did not feel comfortable having her case heard by a Pro-Tem, so she asked for the case to be continued but then decided it should be heard in a higher court, now that USAA's unfair reporting had caused two credit cards to drop her limits over $6000.

39. On or around February 25, 2016, Ms. Douglass was contacted by Angela Lees by Bank of America who posed as an agent of the corporate offices of Bank of America. Ms. Lees told her that the bank did appreciate her business they would never contact Equifax and TransUnion to remove the hard inquiry. Ms. Lees stated over and over that in two more years the bad mark would be removed. When Ms. Douglass tried to say, it was an Error from USAA that caused this credit flag, Angela Lees said, "then you'll have to drop out of school I guess." She was told that the phone call would be recorded, so hopefully you can get it for your records.

40. Plaintiff was shocked, confused and upset, especially given that Bank of America had promised that Ms. Douglass's transaction with them would not affect her

creditworthiness, and because though she paid on time every month, they haphazardly decided to drop her limits without warning and not offer to fix it even though they knew the new information appearing on her credit report was obviously false.

41. Plaintiff believed that such a ridiculous error could and would be remedied easily. Plaintiff explained that after she filed a case against USAA, they reversed all the charges from her credit card. Still Bank of America didn't listen.

42. Plaintiff immediately asked Bank of America to escalate this to request they clear up any errors they had made in their reporting to Equifax and TransUnion, but Ms. Lees refused. Ms. Lees said she spoke on behalf of the CEO of Bank of America and that no further escalation would be attempted to remedy the problem.

43. On February 26, 2016, Ms. Douglass received another letter from Bank of America explaining that her credit limits were severely lowered due to a reporting of late payment (USAA).

44. Ms. Douglass experienced tremendous stress and anxiety. Not only had she never had a late payment with Bank of America, but she found out they never did what they had promised, knowingly deliberately harming her credit reports without a care in the world. When Ms. Douglass saw that the lowering of the two cards also severely affected her credit reports and that bank of America was unwilling to help Ms. Douglass in any way. She decided to go before a judge.

45. After several unsuccessful calls to Bank of America, in February 2016, Ms. Douglass contacted Equifax and TransUnion again by phone to dispute any hard inquiry that Bank of America had made and not removed, and they told her that it was up to Bank of America to remove it and they had never written to them. She also then was told how the drop in the two cards was grossly affecting her credit. Ms. Douglass wondered how this would be different if she was not a person who paid on time every month and had always carried credit and then paid it off.

46. Plaintiff trusted and believed that USAA and Bank of America would not fix the issues after being told that it was up to her. Plaintiff asked Bank of America if she should continue paying her balance at all now that they had destroyed her credit. OF course, she didn't mean that, she just saw that it wouldn't matter. Being a law-abiding citizen is important to Plaintiff and she has never defaulted nor paid late. Plaintiff posed the question, were she to completely stop paying her credit would be as destroyed as it was when she paid in a timely manner every month. To this, Ms. Lees just laughed.

47. Equifax and TransUnion never sent Ms. Douglass its investigation results as to the Bank of America hard inquiry, so in her mind perhaps it was never investigated. Neither the reports of the late payment (even though it was in dispute with USAA) and the hard inquiry.

48. The actions of Bank of America and USAA and Equifax and TransUnion have made Ms. Douglass realize that though she intended to keep up with her payments, they deliberately destroyed her credit as if she had never paid them at all. It made her lose complete faith in the system.

49. Plaintiff was at a loss at how this could possibly be happening to her, given that Equifax, TransUnion and Bank of America knew that such information was obviously wrong, and that it would seem to be very easy to correct such a blatant error.

50. Plaintiff began to think that Equifax, TransUnion, Bank of America and USAA were not conducting anyinvestigations into her disputes at all, nor cared whether or not they were reporting and disseminating false and highly damaging information about her.

51. After the reporting of USAA that Ms. Douglass had not paid a card that was in dispute over a bank error, she got notice that she was dropped from yet a third card. Ms. Douglass lives in fear that USAA will drop her from her cards due to Ms. Maureen Michael threatening this action.

52. As of today, Ms. Douglass's Equifax and TransUnion credit report continues to paint this false and damaging picture of Plaintiff.

53. At this point, Plaintiff is at a complete loss as to what else she can do.

54. Plaintiff is left to question how and why she is supposed to prove that the Bank of America entries are incorrect as reported, and why Bank of America and USAA, TransUnion and Equifax are allowed to get away with skirting their obligations under federal law to report only accurate information about her.

55. The entire experience has imposed upon Plaintiff significant distrust, frustration and distress, and has rendered Plaintiff hopeless as to her ability to regain her good name and the credit rating that she deserves and has worked hard to earn.

56. Ultimately, Plaintiff has desired to take advantage of credit opportunities, most notably, to remain in school but has been unable to do so because of Bank of America's and USAA's and Equifax and TransUnion's failure to report only accurate information about Plaintiff.

57. As a result, Plaintiff has been forced to consider dropping out of school.

58. In light of what has transpired, Ms. Douglass has justifiably avoided applying for additional credit until the inaccurate information is ultimately corrected on her credit report.

59. As of today, Plaintiff remains unable to see how far this has affected her credit, because of the inaccurate credit data being reported by USAA, Bank of America, Equifax and TransUnion.

60. Absent litigation, Plaintiff believes she will forever be harmed by the lack of procedures Bank of America, USAA and Equifax and Transunion have in place to assure the maximum possible accuracy of Plaintiff's credit report.

61. On March 8, 2016 Amberlie Scott called Ms. Douglass from Bank of America and told her that though they electronically sent the information to TransUnion to remove the hard inquiry from her credit report on January 27, 2014, it was not completed by TransUnion.

62. On March 8, 2016 Amberlie Scott also said that though Bank of America lowered Ms. Douglass' limits due to a misreporting of USAA showing a delinquent late payment, that they had zero intention of re-establishing her credit lines. She apologized that it is impacting Ms. Douglass' credit scores but said that they could not re-establish the same line due to inside protocol. Ms. Douglass said she was considering litigation and perhaps Ms. Scott should ask legal counsel to contact Ms. Douglass first, and Ms. Scott said this case was not actually something she was that concerned about. And though Ms. Scott said that this was actually something that was doing enormous damage to Ms. Douglass credit reputation, that again, she confirmed short of litigation, there was nothing Ms. Douglass could possibly do. Ms. Douglass re-iterated that it was due to a mistake by USAA and Ms. Scott said, that is not Bank of America's problem. Ms. Scott confirmed that putting back her limits to what they were, would result in asking for an extension of credit line, even though they lowered two cards due to a mistake made and admitted to by USAA.

63. On March 8, Ms. Douglass received replies from both TransUnion and Equifax, Equifax said they were placing a fraud alert on Ms. Douglass' account, which had nothing to do with the letter Ms. Douglass sent. She only sent a letter requesting that the hard inquiry from Bank of America be removed.

COUNT ONE
VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

64. Plaintiff hereby incorporates by reference all well-pleaded allegations contained in the preceding paragraphs as if fully rewritten herein.

65. A "consumer reporting agency" is defined by the FCRA as follows:
[A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer

reports. 15 U.S.C. § 1681a(f).

66. Equifax and TransUnion are a "consumer reporting agency" as defined by the FCRA.

67. USAA and Bank of America are "furnishers" as that term is used in Section 1681s-2 of the FCRA.

68. Section 1681n of the FCRA imposes civil liability on any CRA or furnisher "who willfully fails to comply with any requirement" of the Act. See 15 U.S.C. § 1681n(a).

69. Section 1681o of the FCRA provides for civil liability against any CRA or furnisher which is negligent in failing to comply with any requirement imposed under the Act.

Equifax's and TransUnion Failure To Adopt and/or Follow Reasonable Procedures

70. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

71. On numerous occasions, Equifax and TransUnion has prepared a patently false consumer report concerning Plaintiff.

72. Despite actual and implied knowledge that Plaintiff did not know of the hard inquiry and that USAA's "adjustment" was in dispute and given Bank of America's willful promise to remove a knowable mistake, Equifax and TransUnion readily sold such false reports to one or more third party, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

73. On each such instance, Equifax and TransUnion willfully and/or negligently failed to follow reasonable procedures to assure maximum possible accuracy of the consumer reports it prepared and/or published pertaining to Plaintiff, in violation of Section 1681e(b).

74. Through Plaintiff's communications with Equifax and TransUnion, Equifax knows, or has sufficient reason to know, that when it prepares and sells a consumer report about Plaintiff, the information it is circulating is extremely inaccurate and damaging to Plaintiff. Nevertheless,Equifax and TransUnion has taken no measures to stop painting a false and damaging picture about Plaintiff causing more than three cards to substantially lower the limits so that Ms. Douglass could not pay her school bills.

75. Plaintiff remains unable to obtain credit because of the grossly inaccurate credit file maintained by Equifax.

76. Plaintiff has suffered out-of-pocket loss as a result of Equifax's willful and/or negligent violations of the FCRA including, without limitation, the premiums Plaintiff must spend for a credit monitoring service.

77. Plaintiff is not currently free to take advantage of various credit opportunities available to other consumers because of Equifax's failure to report only accurate information
about her.

78. As a direct and proximate result of Equifax's willful and/or negligent refusal to follow reasonable procedures to assure "maximum possible accuracy" as specifically mandated by the FCRA, Plaintiff has suffered loss and damage including, but not limited to: economic loss due to denial of credit that she once had, loss of opportunity to obtain credit, damage to reputation,
expenditure of considerable time and out-of-pocket expenses, worry, fear, distress, frustration and embarrassment, entitling her to an award of actual damages in amounts to be proved at trial,plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

79. Upon information and belief, Equinox has been sued on multiple occasions over the past ten (10) years for falsely reporting that an individual was "a bad payer," despite being on notice that such a bank reported falsely.

80. Upon information and belief, Equifax and TransUnion have exhibited a pattern of refusing to follow reasonable procedures as mandated by the FCRA, ultimately valuing its own bottom line above its "grave responsibility" to report accurate data on consumers.

81. Equifax and TransUnion's pattern of refusal to follow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiff. The injuries suffered by Plaintiff are attended by circumstances of fraud, malice, and willful and wanton misconduct, entitling Plaintiff to statutory damages, punitive damages, attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(2).

Equifax's and TransUnion Failure To Conduct Reasonable Reinvestigations

82. The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day time limitation for the completion of such an investigation. Id.

83. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is, in fact, inaccurate, or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

84. On multiple occasions in 2015, Ms. Douglass has initiated disputes with Equifax requesting that they correct and/or delete a specific item in her credit file that is patently inaccurate, misleading and highly damaging to her, namely, references to her being "a late or bad payer" within the USAA trade line.

85. Plaintiff specifically advised Equifax and TransUnion on numerous occasions that a mistake hadbeen made, provided all necessary information to Equifax and TransUnion to support same, and requested the trade line be corrected accordingly, i.e., any references to "being a bad payer" and "any hard inquiries from Bank of America that were not permissible" be deleted.

86. Either Equifax and TransUnion conducted no investigation of Ms. Douglass's disputes, or such"investigations" were so shoddy as to allow objectively false and highly damaging information to remain in Ms. Douglass's credit file. In writing Ms. Douglass received a letter stating that the investigation resulted in a fraud alert going on Ms. Douglass' credit report, something that Ms. Douglass did not initiate.

87. By failing to conduct a reasonable investigation into Plaintiff's disputes in this regard, Equifax and TransUnion willfully and/or negligently violated 15 U.S.C. § 1681i(a)(1) with respect to each dispute lodged by Plaintiff.

88. As a direct and proximate result of Equifax's and TransUnion's repeated disregard for each of Plaintiff's disputes as outlined above, Plaintiff has suffered a significant loss of trust in the credit reporting system and its accountability to the average consumer.

89. As a direct and proximate result of Equifax's and TransUnion's willful and/or negligent refusal to conduct reasonable investigations as mandated by the FCRA as outlined above, Plaintiff has suffered loss and damage including, but not limited to: economic loss due to denial of credit, loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of-pocket expenses, worry, fear, distress, frustration and embarrassment, entitling her to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

90. Upon information and belief, Equifax and TransUnion have been sued on multiple occasions over the past ten (10) years for refusing to correct its patently false reporting of an individual as "a bad payer," despite being on notice that this information was totally and patently false.

91. Upon information and belief, Equifax and TransUnion have exhibited a pattern of refusing to correct consumer credit files despite being on notice of patently false information contained in such files, ultimately valuing its own bottom line above its "grave responsibility" to report accurate data on consumers.

92. Equifax and TransUnion's pattern of refusal to correct patently false information as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiff. The injuries suffered by Plaintiff are attended by circumstances of fraud, malice, and/or willful and wanton misconduct, calling for statutory damages, an assessment of punitive damages against Defendant, plusattorneys' fees and costs pursuant to 15 U.S.C. § 1681n. USAA and Bank of America's Bank's Failure To Conduct Reasonable Reinvestigations.

93. Furnishers of credit information have a duty under the FCRA to investigate disputes from consumers as to the accuracy of information reported about them, to wit:
After receiving notice pursuant to section 611(a)(2) [§ 1681i] of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall:
(A) conduct an investigation with respect to the disputed information;
(B) review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2) [§ 1681i];
(C) report the results of the investigation to the consumer reporting agency;
(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly –
(i) modify that item of information;
(ii) delete that item of information; or
(iii) permanently block the reporting of that item of information.
See 15 U.S.C. § 1681s-2(b)(1).
USAA violated this act, actually writing to Ms. Douglass and telling her in writing that no further investigation will be made. Bank of America did not investigate or dispute it at all, citing that this hard inquiry will not be removed and the only investigation we can do to restore your credit will further damage your credit resulting in a hard inquiry.

94. On or around November 2, 2015, Plaintiff contacted Equifax and TransUnion to dispute the accuracy of the information being reported about her.

95. Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), USAA and Bank of America received notification of this dispute from Equifax and TransUnion.

96. By the time USAA received this credit bureau dispute, USAA had already been contacted on over 45 occasions by Plaintiff, advising USAA that it had reported her as a bad or late payer, causing Bank of America to drop her limits in the amount of $6000. Equifax and TransUnion credit report was not reflecting the disputes no

matter how many times she tried to explain in writing and verbally to them and that it was causing her problems with being approved for credit.

97. USAA failed to conduct a reasonable investigation into the accuracy of information related to the disputed "adjustment", in violation of Section 1681s-2(b)(1).

98. Notwithstanding USAA's actual knowledge that Plaintiff's "debt" was not a purchase but an actual mathematical error, USAA's failure to conduct a reasonable investigation of the accuracy of its reporting of this adverse information shows a reckless disregard for Plaintiff's rights under the FCRA. USAA also failed to report this dispute to TransUnion and Equifax instead turning Ms. Douglass in to Collection Agency (USAA owned) and reporting Ms. Douglass' account as delinquent even though she had repeatedly tried to dispute this "ghost adjustment" on two separate cards. (One in the amount of $1000 and the other in the amount of $500 plus interest and plus late fees even though this was disputed).

99. In addition to the violation as described above, Bank of America and USAA failed to satisfy their duty under Section 1681s-2(b) of updating incomplete or inaccurate information it had previously reported to CRAs upon receipt of each notice from Equifax and TransUnion that Plaintiff disputed the accuracy of the previously reported information.

100. In addition to the violation as described above, USAA failed to satisfy their duty under Section 1681s-2(b) and employed itself as its own collection agency.

101. USAA's failure to report that Plaintiff disputed the accuracy of the "dispute" was a failure to accurately update the information because it was "misleading in such a way that caused Bank of America to drop Ms. Douglass limits from two cards, grossly affecting her life, reputation, credit reputation and the like.
to such an extent that it [could] be expected to have an adverse effect" on Plaintiff. See: Gorman v. Wolpoff & Abrasion, LLP, et al., 584 F.3d 1147 (9th Cir. 2009); See also Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142 (4th Cir. 2008).

102. As a direct and proximate result of USAA and then Bank of America's willful and/or negligent refusal to comply with the FCRA as outlined above, Plaintiff has suffered substantial loss and damage including, but not limited to: economic loss due to denial of credit line, loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of-pocket
expenses, worry, fear, distress, frustration and embarrassment, entitling her to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

103. USAA and Bank of America's complete and utter indifference as to its obligations under the FCRA reveals a conscious disregard of the rights of Plaintiff, and the injuries suffered by Plaintiff are attended by circumstances of fraud, malice,

and willful and wanton misconduct, calling for an assessment of punitive damages against USAA and Bank of America, TransUnion and Equifax, pursuant to 15 U.S.C. § 1681n(a)(2).

WHEREFORE, Plaintiff, Lisa
Douglass, respectfully prays this Court for the
following relief:

A) Actual damages in an amount to be proved at trial;
B) Punitive damages as provided for by 15 U.S.C. § 1681n(2);
C) Statutory damages as provided for by 15 U.S.C. § 1681n(2);
D) Costs and attorneys' fees as provided for by 15 U.S.C. § 1681n(3) and
15 U.S.C. § 1681o(2); and
E) Such other and further relief as this Court deems just and proper.

Dated this _8, March, 2016. Respectfully submitted.


JURY DEMAND
Plaintiff respectfully demands a trial by jury on all issues so triable in this lawsuit.
Dated this 12th day of March, 2016.

DATED this 12th day of March 2016.
_____ Plaintiff

CERTIFICATE OF SERVICE
The undersigned hereby certifies that he/she served the attached Complaint to all parties herein by mailing a copy by First Class United States Mail, postage prepaid to the addresses identified below.

TransUnion, Corporation
DBA
United States Corporation Company
2710 Gateway Oaks Dr. Ste. 150
Sacramento, CA 95833

Equifax, Inc.
DBA --- CSC—Lawyers Incorporating Service
United States Corporation Company
2710 Gateway Oaks Dr. Ste. 150
Sacramento, CA 95833

Bank of America Corporation, Inc.
(CT Corporation System)
818 West Seventh St. Ste. 930
Los Angeles, CA 90017

USAA Casualty Insurance Company, Inc.
(CT Corporation System)
818 West Seventh St. Ste. 930
Los Angeles, CA 90017


Lisa Douglass
101 s. Sycamore Av. #5
Los Angeles, CA 90036
Lisa_douglass@icloud.com
323-346-5175